## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DROP, INC., | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-02098 |
| DANIAL DANISH, DANIAL DANISH CONSULTANCY, INC., ERIK SUNDBERG, and AZMI CONSULTING, INC., | Honorable Rebecca R. Pallmeyer |
| Defendants. | |

### DEFENDANTS' VERIFIED ANSWER TO DROP INC.'S VERIFIED COMPLAINT

Defendants Danial Danish, Danial Danish Consultancy, Inc., and Azmi Consulting, Inc.

(collectively referred to as "Danish"), through their attorneys Trivedi & Khan, P.C., and for their

Verified Answer to Drop Inc.'s Verified Complaint, state as follows:

### ANSWER

1.  Plaintiff Drop, Inc. is an Illinois corporation with its principal place of business located at 3 Grant Square #155, Hinsdale, IL 60521. Drop is a citizen of the state of Illinois.

**ANSWER:** Danish admits the allegations of paragraph 1.

2.  Defendant Danial Danish is a U.S. citizen who, upon information and belief, is a citizen of the state of Nevada. Danish is the owner and Chief Operating Officer of Defendant Danish Consultancy.

**ANSWER:** Danish admits to the allegations of paragraph 2.

3.  Defendant Danish Consultancy is a Nevada corporation with its principal place of business located at 10452 Hartford Hills Ave., Las Vegas, NV. Danish Consultancy is, upon information and belief, a citizen of the state of Nevada.

**ANSWER:** Danish admits to the allegations of paragraph 3.

4.  Upon information and belief, Danish Consultancy is the alter ego of Danish, such that the actions of Danish constitute the actions of Danish Consultancy.

1

**ANSWER:** Denied.

5.   Defendant Erik Sundberg is a U.S. citizen who, upon information and belief, is a citizen of the state of Illinois. Sundberg is a network engineer who works with and at the direction of Danish Consultancy.

**ANSWER:**  Danish denies that Sundberg is a network engineer working for Danish

Consultancy.  Danish does not have sufficient information to admit or deny the remaining

allegations of paragraph 5.

6.   Defendant Azmi Consulting is, upon information and belief, a Canadian corporation with its principal place of business located at 4433 Sheppard Ave., East Toronto, Ontario, M1S 1V3. Azmi Consulting is, upon information and belief, a citizen of Canada. Danish represents himself to the public as being affiliated with Azmi Consulting, including using the Azmi name in multiple email addresses.

**ANSWER:**   Danish admits that Azmi is a Canadian corporation.   The remaining

allegations are denied.

7.   This Court has personal jurisdiction over Defendants Danish, Danish Consultancy, Sundberg, and Azmi Consulting pursuant to Illinois' long-arm statute, 735 ILCS 5/2-209 *et seq*., because they or their agents, as described in more detail below, transact business in Illinois and / or committed a tortious act in Illinois, which acts form the basis of the causes of action alleged herein. This Court also has personal jurisdiction over Defendants Danish and Danish Consultancy because they agreed to jurisdiction in this district.

**ANSWER:**  Paragraph 7 contains legal conclusion an answer to which is not required.

8.   This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Drop's claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), because those claims arise under federal law.

**ANSWER:**  Paragraph 8 contains legal conclusion an answer to which is not required.

9.   This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) over Drop's remaining claims because those claims are so related to Drop's federal claims that they together form part of the same case or controversy.

**ANSWER:**  Paragraph 9 contains legal conclusion an answer to which is not required.

10.  Venue is proper as to all Defendants pursuant to 28 U.S.C. § 1391(b) inasmuch as a

substantial part of the events giving rise to the claim occurred in this district, because the intellectual property that is the subject of this action is situated in this district, and because all Defendants are subject to personal jurisdiction in this district.

      **ANSWER:** Paragraph 10 contains legal conclusion an answer to which is not required.

      11. Drop brings this case in response to the Defendants' malicious and willful violations of contractual and intellectual property rights. Drop trusted its intellectual property to Defendants Danish and Danish Consultancy when it hired them to oversee certain of Drop's business operations. As a condition to Danish receiving Drop's confidential and proprietary information, Danish agreed to respect and protect that information. Sundberg and Azmi Consulting assisted Danish with his oversight obligations and, through Danish and Danish Consultancy, were aware that Drop's confidential and proprietary information had to be protected. Nevertheless, Danish and his company Danish Consultancy, by themselves and with Sundberg and Azmi Consulting, have taken Drop's proprietary technology and are using it and the valuable intellectual property it embodies to directly compete with Drop using Drop's own inventions.

      **ANSWER:** Denied.

      12. This conduct constitutes misappropriation of trade secrets, breach of the parties' agreements, and violation of the Computer Fraud and Abuse Act.

      **ANSWER:** Denied.

      13. Drop is a technology company that developed a proprietary platform for sending ringless voice mails ("RVMs"). RVMs are messages sent directly through voice mail without ringing the recipient's phone. RVMs are an effective telemarketing method because people are more likely to listen to a voicemail than they are to answer a call from a telemarketer.

      **ANSWER:** Danish admits that Drop is a company engaging in the sale of RVM services.

Danish denies the remaining allegations of paragraph 13.

      14. Drop's customers create the voicemail content and utilize Drop's proprietary platform to deliver that content to the telephone numbers of the customers' desired recipients of the voicemail. The customer may also use Drop's platform to receive and automatically redirect return calls from the recipients using interactive voice response. Drop's customers send RVMs to recipients and receive and redirect calls from recipients located outside of Illinois.

      **ANSWER:** Danish does not have sufficient knowledge concerning Drop's businesses and

customers to admit or deny those allegations. Danish denies that Drop's platform is proprietary.

      15. Drop's proprietary technology is embodied in computer code and performs at least three proprietary functions. The first function sends direct voicemails without ringing the

recipient's phone (Drop's "RVM Technology"). The second function reduces the cost of sending RVMs (Drop's "Cost-Savings Technology"). And the third function indicates when a RVM recipient calls back and redirects the call to a particular company representative or to an automated system that conducts the caller through a series of prompts (Drop's "Interactive Voice Response Technology" or "IVR Technology"). Drop expended significant resources in developing these proprietary technologies and code, and they are not generally known and are not readily ascertainable by proper means. Drop's combination of its proprietary technologies (its "RVM Services") gives Drop a significant cost advantage over its competitors.

**ANSWER:** Denied.

16. Drop stores the proprietary technology for its RVM Services on a cloud server owned and managed by a company named Digital Ocean. Drop provides access to its RVM Services to customers located both inside and outside of Illinois and customers use Drop's RVM Services to deliver RVMs to recipients located both inside and outside of Illinois, all through Drop's use of its proprietary technology stored on the Digital Ocean servers.

**ANSWER:** Danish denies that Drop's technology is proprietary. Danish admits that some of the technology is stored on a cloud server. Danish does not have sufficient information to admit or deny the remaining allegations of Paragraph 16, and therefore denies them.

17. To implement its RVM Services, Drop purchases telecom minutes in bulk from a third-party vendor which are then used to send the RVMs for the RVM Services (the "Telecom Minutes"). Drop also requires the use of a certain number of phone lines with various phone service carriers (the "RVM Phone Lines"). Acquiring, managing, and maintaining the RVM Phone Lines is a time-consuming process, as is ensuring the RVM Phone Lines are properly using the Telecom Minutes for the RVM Services.

**ANSWER:** Danish admits that Drop purchases telecom minutes from third party vendors. Danish denies the remaining allegations of Paragraph 17.

18. In 2019, Drop began to explore contracting with Danish (through Danish Consultancy) to (1) prepare and manage certain computer code used in Drop's business; (2) acquire, manage, and maintain Drop's RVM Phone Lines; and (3) sell Drop's RVM Services to end customers.

**ANSWER:** The December 1, 2019 Agreement speaks for itself. Danish denies any allegations that contradict the language of the Agreement.

19. To that end, on December 1, 2019 Drop and Danish, individually and on behalf of Danish Consultancy, entered a Mutual Confidentiality, Non-Disclosure, and Non-Compete Agreement. Ex. A.

4

**ANSWER:** The December 1, 2019 Agreement speaks for itself. Danish denies any

allegations that contradict the language of the Agreement.

20. On March 27, 2020, Drop and Danish Consultancy entered into a Contractor Agreement under which Danish Consultancy agreed to perform certain specified work regarding the acquisition, management, and maintenance of Drop's RVM Phone Lines. Ex. B. Under the Contractor Agreement, Danish Consultancy acknowledged that Drop owned all Work Product that Danish Consultancy developed or obtained in providing services and deliverables to Drop, and that Danish Consultancy must treat Drop's Confidential Information as confidential and protect it. *Id.* §§ 4, 5.

**ANSWER:** The March 27, 2020 Agreement speaks for itself. Danish denies any

allegations that contradict the language of the Agreement.

21. On July 11, 2020, Drop and Danish Consultancy entered into two additional agreements: a Sales Representation Agreement, and a Dedicated Carrier Line Acquisition & Management Agreement ("Line Agreement") (the Contractor Agreement, Sales Representation Agreement, and Line Agreement, together, are the "Agreements"). Exs. C, D. Under the Sales Representation Agreement, Danish Consultancy agreed to provide certain sales representation services associated with the sale of Drop's RVM Services to end customers. Ex. C § 3 & pp. 19-

**ANSWER:** The July 11, 2020 agreements speak for themselves. Danish denies any

allegations that contradict the language of the agreements.

22. Under the Line Agreement, Danish Consultancy agreed to manage Drop's relationships with third-party vendors for obtaining the RVM Phone Lines and to maintain and repair the RVM Phone Lines. Ex. D § 3 & pp. 19-23. Both the Sales Representation Agreement and the Line Agreement prohibit Danish Consultancy from using Drop's intellectual property, Customer Materials, or Confidential Information except as necessary to provide services under the Agreements, and from disclosing Drop's confidential information without Drop's prior written consent. Exs. C & D §§ 8, 9.

**ANSWER:** The various agreements speak for themselves. Danish denies any allegations

that contradict the language of the agreements.

22. Before working with Drop, Danish had not worked with technology for sending direct voicemails using a technology like the Cost-Savings Technology.

**ANSWER:** Denied.

23. Before working with Drop, Danish had not worked with technology for indicating when a RVM recipient calls back and then redirecting the returned call to a particular company

representative or to an automated system that conducts the caller through a series of prompts such as the IVR Technology.

**ANSWER:** Denied.

24. And, while Danish had some prior experience with voicemail marketing, before working with Drop, Danish had not worked with technology for delivering ringless voicemails that was the same as Drop's proprietary RVM Technology.

**ANSWER:** Denied.

25. Thus, Danish's first exposure to these technologies arose from his work with Drop.

**ANSWER:** Denied.

26. To overcome his technical deficiencies, Danish hired Sundberg, who was familiar with Asterisk, the programming language used in Drop's proprietary technology. Once hired, Sundberg became the main technical lead for Danish Consultancy regarding its work with Drop and directly interacted with Drop concerning this work.

**ANSWER:** Danish admits that Sundberg was hired to use the Asterisk language per

Drop's instruction. Danish denies the remaining allegations.

27. Like Danish, before working with Drop, Sundberg had not worked with technology for sending direct voicemails like the Cost-Savings Technology.

**ANSWER:** Denied. Danish cannot admit or deny whether Sundberg had previously had

experience with Cost-Savings Technology.

28. Like Danish, before working with Drop, Sundberg had not worked with technology for indicating an a RVM recipient calls back and then redirecting the returned call to a particular company representative or to an automated system that conducts the caller through a series of prompts such as the IVR Technology.

**ANSWER:** Danish admits that prior to Danish's engagement with Sundberg, Sundberg

did not have experience in IVR Technology.

29. From his interactions with each of Danish and Drop, Sundberg knew or had reason to know that Drop, and not Danish, originated and held the rights to Drop's Cost-Savings Technology, RVM Technology, and IVR Technology.

**ANSWER:** Denied.

6

30.    To facilitate Danish Consultancy's work under these Agreements, Drop provided Danish Consultancy administrator access to Drop's Digital Ocean servers. Consistent with the Agreements, Danish Consultancy could only access the server for appropriate purposes under the Agreements, and all information on the servers remained Drop's valuable proprietary and confidential information.

**ANSWER:**  Danish admits that they had access to the Digital Ocean servers.  Danish

denies that the information was proprietary.  Danish defers to the language of the various

agreements and denies any allegations that are inconsistent with the agreements.

31.    The information on the servers to which Drop provided Danish Consultancy with access included Drop's Cost-Savings Technology, RVM Technology, and IVR Technology.

**ANSWER:**  Danish admits that the various technologies were accessible through the

server, but denies that the technologies were proprietary.

32.    After signing the agreements, Danish Consultancy, through Danish and Sundberg, assisted in the development of the IVR Technology with Drop. Under the terms of the Contractor Agreement and other Agreements, the IVR Technology belongs solely to Drop.

**ANSWER:**  Danish admits that they assisted with the development of the various

technologies.  The Agreements speak for themselves, Danish denies the remaining allegations to

the extent they contradict the Agreements.

33.    Problems soon arose with Danish Consultancy's work. Danish Consultancy failed to maintain and repair Drop's RVM Phone Lines as required, impeding Drop's ability to deliver its RVM Services to its customers. The issue became significant, with some RVM Phone Lines from certain telecom providers being in constant disrepair.

**ANSWER:**  Denied. The issues resulted from Drop's customers scamming ATT

subscribers, and therefore ATT shut down lines.

34.    Drop consistently worked with Danish, Sundberg, and Danish Consultancy to try

and resolve the issues with the RVM Phone Lines, often to no avail. Through conversations with

Danish and Sundberg regarding these problems over a period, Drop uncovered that Danish had

taken Drop's technology and placed it on his own system.

**ANSWER:** Danish admits that they worked to resolve certain phone line issues. Danish

denies the remaining allegations.

35.     Specifically, when discussing alternatives to resolve Danish Consultancy's
inability to provide working RVM Phone Lines for certain telecom companies for Drop's use,
Danish stated that he had placed the Cost-Savings Technology on his "own system" and was
experimenting with the technology to increase its efficiency.

**ANSWER:** Danish admits that after notifying Drop, they downloaded the code to improve

the system. Danish denies the remaining allegations of paragraph 35.

36.     Then, in testing some of the operations of the IVR Technology as part of the repair
of RVM Phone Lines, Drop learned that Danish had placed the IVR Technology on his own
system. Danish gave Drop access to Danish's system, which Drop used to confirm it contained
Drop's IVR Technology.

**ANSWER:** Danish admits that IVR Technology was on their system, and that Drop was

aware of it. Danish denies the remaining allegations in Paragraph 36.

37.     Under the Agreements, the Cost-Savings Technology and IVR Technology were
Drop's property, as were any improvements or modifications to those technologies. Drop did not
authorize Danish's transfer and use of the Cost-Savings Technology and IVR Technology on his
own system. But, because Drop believed that Danish was continuing to work for Drop, Drop did
not have any reason to immediately demand return of those technologies to Drop and removal of
those technologies from Danish's system.

**ANSWER:** Danish admits that Drop had no issue with Danish working with the

Technologies on their system. Danish also states that the Agreements speak for themselves.

Danish denies any allegations that contradict the Agreements. Danish denies the remaining

allegations of Paragraph 37.

38.     As Drop continued to work with Danish and Sundberg to try and overcome Danish
Consultancy's issues with the RVM Phone Lines, Drop learned that Danish Consultancy's
failure to deliver the RVM Phone Lines was not a technical issue, but rather a result of Danish
taking steps to mimic Drop's precise business strategy and systems to start a directly-competing
and identical business.

**ANSWER:** Denied.

39.     Specifically, Drop learned that Danish was buying more than 3 million Telecom

Minutes per week, which constitutes a substantial telemarketing volume. Danish purchased these minutes in the name of Azmi Consulting to hide them from Drop.

**ANSWER:** Danish denies that Azmi Consulting had any involvement in the purchases.

Danish admits that they have purchased telecom minutes. Danish denies the remaining allegations.

40. In investigating Danish's purchase of these Telecom Minutes in the name of Azmi Consulting, Drop tracked their use to servers owned and operated by the exact same server company that Drop was using, Digital Ocean. Drop also found that the servers used the exact same naming scheme as Drop used for its servers that run Drop's RVM Services.

**ANSWER:** Danish does not have information to admit or deny these allegations, and

therefore denies them.

41. Meanwhile, Danish bragged to Drop's members about starting his own RVM business that used the same kind of RVM Technology as Drop. Sundberg plays or played a critical part in developing and implementing that RVM business on Danish's behalf.

**ANSWER:** Danish admits that they have a RVM company and that Sundberg has played

a role. Danish denies the remaining allegations of Paragraph 41.

42. Given Danish's admissions about starting his own RVM business, the purposes behind Danish taking Drop's proprietary technology became clear. Danish took Drop's proprietary Cost-Savings Technology without permission. He took Drop's IVR Technology without permission. He is using Drop's server company, Digital Ocean, to host Drop's stolen technology on servers named in the identical manner as on Drop's servers. He is using Drop's source for Telecom Minutes. He is selling or attempting to sell millions and millions of minutes of RVMs to third parties. And he did so with the assistance of Sundberg and Azmi Consulting, both of whom knew or had reason to know that Danish and Danish Consultancy acquired Drop's confidential and proprietary information by improper means. In short, Danish and Danish Consultancy, with the knowing aid and assistance of Sundberg and Azmi Consulting, cloned Drop's entire business – including its proprietary technology – in direct violation of the parties' agreements and of Illinois and federal law. And Danish and Sundberg did all of this while pretending to provide consulting, sales assistance, and line servicing services to Drop, when in fact they were acting in a manner that would cripple Drop's ongoing business operations.

**ANSWER:** Denied.

43. Upon discovering this conduct, Drop worked diligently to obtain a new source for RVM Phone Lines and for technical consulting, sales, and related services. It now brings this action to halt and remedy Defendants' ongoing and willful violations of the parties' agreements and Drop's rights.

**ANSWER:** Denied.

**COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836(b)**

44. Drop incorporates its allegations in Paragraphs 1-43 above.

    **ANSWER:** Danish incorporates their answers to Paragraph 1-43 above.

45. Drop's proprietary technologies in its RVM Services constitute a trade secret, as they consist of information that derives actual or potential economic value from not being generally known to other person who can obtain economic value from its disclosure or use, and the information has been and continues to be the subject of efforts by Drop that are reasonable under the circumstances to maintain its secrecy or confidentiality. For example, Drop restricts access to and disclosure of its technology by physically securing its facilities and documents, storing its technology on password-protected servers, limiting access to only those persons with a need to know, employing confidentiality agreements with its employees and contractors, and other similar measures.

    **ANSWER:** Denied.

46.    Drop's RVM Services are a service used or intended for use in interstate commerce, as Drop provides those services to customers located both inside and outside of Illinois and uses its RVM Services to deliver RVMs on behalf of its customers to recipients located both inside and outside of Illinois.

    **ANSWER:** Admitted.

47.    Defendants Danish and Danish Consultancy misappropriated Drop's technology for its RVM Services by using improper means to acquire knowledge of it, specifically, by secretly and without authorization copying Drop's technology from Drop's server, and then by using or disclosing Drop's technology without Drop's express or implied consent in order to operate a competing RVM business, all in violation of contractual obligations not to use or disclose Drop's confidential information except to provide specified services to Drop.

    **ANSWER:** Denied.

48. Sundberg further misappropriated this technology by facilitating the transfer and implementation of Drop's technology on Danish and Danish Consultancy's behalf.

    **ANSWER:** Denied.

49. Defendant Azmi Consulting misappropriated Drop's technology for its RVM Services by either using that technology itself, or by facilitating the use of that technology by Danish and Danish Consultancy without Drop's express or implied consent, knowing the same to have been acquired by improper means, in order to operate a competing RVM business. Azmi Consulting facilitates the purchase of Telecom Minutes by allowing Danish to purchase Telecom Minutes in

its name, which Telecom Minutes are used to misappropriate Drop's technology by the operation of RVM Services improperly using Drop's technology, and Azmi Consulting either operates those services itself or facilitates Danish and Danish Consultancy's operation of those services, all while knowing or having reason to know the technology was acquired by improper means.

**ANSWER:** Denied.

50.     Unless restrained and enjoined, Defendants' continued disclosure and use of Drop's trade secrets threatens Drop with irreparable harm by depriving Drop of control over and exclusive use of its trade secret information.

**ANSWER:** Denied.

51.     As a result of Defendants' misappropriation of its trade secrets, Drop has suffered loss of its valuable trade secret information, loss of customers, and other damages in an amount to be determined.

**ANSWER:** Denied.

**COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER 765 ILCS 1065**

52.     Drop incorporates its allegations in Paragraphs 1-51 above.

**ANSWER:** Danish incorporates their answers to Paragraph 1-51 above.

53.     Drop's proprietary technologies in its RVM Services constitute a trade secret, as they consist of information that derives actual or potential economic value from not being generally known to other person who can obtain economic value from its disclosure or use, and the information has been and continues to be the subject of efforts by Drop that are reasonable under the circumstances to maintain its secrecy or confidentiality. For example, Drop restricts access to and disclosure of its technology by physically securing its facilities and documents, storing its technology on password-protected servers, limiting access to only those persons with a need to know, employing confidentiality agreements with its employees and contractors, and other similar measures.

**ANSWER:** Denied.

54.     Defendants Danish and Danish Consultancy misappropriated Drop's technology for its RVM Services by using improper means to acquire knowledge of it, specifically, by secretly and without authorization copying Drop's technology from Drop's server, and then by using or disclosing Drop's technology without Drop's express or implied consent in order to operate a competing RVM business, all in violation of contractual obligations not to use or disclose Drop's confidential information except to provide specified services to Drop.

**ANSWER:** Denied.

11

55.     Sundberg further misappropriated this technology by facilitating the transfer and implementation of Drop's technology on Danish and Danish Consultancy's behalf.

   **ANSWER:** Denied.

56.     Defendant Azmi Consulting misappropriated Drop's technology for its RVM Services by either using that technology itself, or by facilitating the use of that technology without Drop's express or implied consent by Danish and Danish Consultancy, knowing the same to have been acquired by improper means, in order to operate a competing RVM business. Azmi Consulting facilitates the purchase of Telecom Minutes by allowing Danish to purchase Telecom Minutes in its name, which Telecom Minutes are used to misappropriate Drop's technology by the operation of RVM Services improperly using Drop's technology, and Azmi either operates those services itself or facilitates Danish and Danish Consultancy's operation of those services, all while knowing or having reason to know the technology was acquired by improper means.

   **ANSWER:** Denied.

57.     Unless restrained and enjoined, Defendants' continued disclosure and use of Drop's trade secrets threatens Drop with irreparable harm by depriving Drop of control over and exclusive use of its trade secret information.

   **ANSWER:** Denied.

58.     As a result of Defendants' misappropriation of its trade secrets, Drop has suffered loss of its valuable trade secret information, loss of customers, and other damages in an amount to be determined.

   **ANSWER:** Denied.

## COUNT III – ALTER EGO

59.     Drop incorporates its allegations in Paragraphs 1-58 above.

   **ANSWER:** Danish incorporates their answers to Paragraph 1-58 above.

60.     Danish is one of the owners of Danish Consultancy.

   **ANSWER:** Admitted.

61.     Danish Consultancy is undercapitalized relative to its business and obligations.

   **ANSWER:** Denied.

62.     Upon incorporation, Danish Consultancy listed its capital as $10.00.

   **ANSWER:** Denied.

63.     As of the date this action is filed, Danish Consultancy is not in good standing in the State of Nevada.

     **ANSWER:** Danish does not have sufficient information to admit or deny the allegations.

64.     Danish exercises significant influence and governance over Danish Consultancy.

     **ANSWER:** Denied.

65.     Danish's exercise of control and ownership of Danish Consultancy is so significant that there is a unity of interest and ownership between Danish and Danish Consultancy such that one is inseparable from the other.

     **ANSWER:** Denied.

66.     Because of this undercapitalization and unity of interest, the failure to hold Danish accountable for the obligations and liabilities of Danish Consultancy would, under these circumstances, sanction a fraud or promote injustice.

     **ANSWER:** Denied.

67.     As such, Danish should be treated as the alter ego of Danish Consultancy, and any corporate liability shield between Danish and Danish Consultancy should be pierced for purposes of this litigation.

     **ANSWER:** Denied.

## COUNT IV – BREACH OF CONTRACT

68.     Drop incorporates its allegations in Paragraphs 1-67 above.

     **ANSWER:** Danish incorporates their answers to Paragraph 1-67 above.

69.     Drop and Danish Consultancy are parties to the Contractor Agreement. The Contractor Agreement is a valid, enforceable contract.

     **ANSWER:** Paragraph 69 contains a legal conclusion for which an answer is not required.

70.     Drop substantially performed its obligations under the Contractor Agreement by paying all fees owed under the Agreement less any credits.

     **ANSWER:** Denied.

71.     Danish Consultancy breached and continues to breach the Contractor Agreement, including by using and disclosing Drop's Confidential Information without Drop's authorization and outside the scope of permissible use and disclosure under the Contractor Agreement in

breach of Section 5.0.

**ANSWER:** Denied.

72.     As a result of Danish Consultancy's breaches, Drop has suffered and continues to suffer damages in an amount to be determined.

**ANSWER:** Denied.

## COUNT V – BREACH OF CONTRACT

73.     Drop incorporates its allegations in Paragraphs 1-72 above.

**ANSWER:** Danish incorporates their answers to Paragraph 1-72 above.

74.     Drop and Danish Consultancy are parties to the Line Agreement. The Line Agreement is a valid, enforceable contract.

**ANSWER:** Paragraph 74 contains a legal conclusion for which an answer is not required.

75.     Drop substantially performed its obligations under the Line Agreement by paying all fees owed under the Agreement less any credits.

**ANSWER:** Denied.

76.     Danish Consultancy breached and continues to breach the Line Agreement, including by using and disclosing Drop's Customer Materials and Confidential Information without Drop's authorization and outside the scope of permissible use and disclosure under the Line Agreement in breach of Sections 8 and 9, and by failing to perform the work Danish Consultancy was required to perform under the Line Agreements, including the work of sourcing, maintaining, and repairing Drop's phone lines.

**ANSWER:** Denied.

77.     As a result of Danish Consultancy's breaches, Drop has suffered and continues to suffer damages in an amount to be determined.

**ANSWER:** Denied.

## COUNT VI – BREACH OF CONTRACT

78. Drop incorporates its allegations in Paragraphs 1-77 above.

**ANSWER:** Danish incorporates their answers to Paragraph 1-77 above.

79. Drop and Danish Consultancy are parties to the Sales Representation Agreement.

14

The Contractor Agreement is a valid, enforceable contract.

**ANSWER:** Paragraph 79 contains a legal conclusion for which an answer is not required.

80. Drop substantially performed its obligations under the Sales Representation Agreement by paying all fees owed under the Agreement less any credits.

**ANSWER:** Denied.

81. Danish Consultancy breached and continues to breach the Representation Agreement, including by using and disclosing Drop's Customer Materials and Confidential Information without Drop's authorization and outside the scope of permissible use and disclosure under the Line Agreement in breach of Sections 8 and 9.

**ANSWER:** Denied.

82.    As a result of Danish Consultancy's breaches, Drop has suffered and continues to suffer damages in an amount to be determined.

**ANSWER:** Denied.

**COUNT VII – VIOLATION OF COMPUTER FRAUD AND ABUSE ACT,
18 U.S.C. § 1030**

83. Drop incorporates its allegations in Paragraphs 1-82 above.

**ANSWER:** Danish incorporates their answers to Paragraph 1-83 above.

84. The cloud server where Drop stores its proprietary technology and by means of which Drop conducts its RVM business is a protected computer under 18 U.S.C. § 1030(e), as Drop uses the server in interstate commerce.

**ANSWER:** Paragraph 84 contains legal conclusions for which an answer is not required.

Otherwise, denied.

85. Defendants Danish, Danish Consultancy, and Sundberg intentionally accessed Drop's server without authorization or by exceeding authorized access and thereby obtained information from the server, including Drop's proprietary computer code.

**ANSWER:** Denied.

86.    Defendants Danish, Danish Consultancy, and Sundberg knowingly and with intent to defraud accessed Drop's server without authorization or by exceeding authorized access to obtain Drop's valuable proprietary computer code and to then use that code to secretly develop a

RVM business in competition with Drop.

      **ANSWER:** Denied.

87.     Drop has incurred a loss in excess of $5,000 as a result of Defendants' accessing Drop's server without authorization or by exceeding authorized access.

      **ANSWER:** Denied.

Dated: July 13, 2021                        Respectfully submitted,
**DANIAL DANISH, DANIAL DANISH CONSULTANCY, INC., and AZMI CONSULTING, INC.**

                                          *s/ Zubair A. Khan*
                                     BY: One of their attorneys

Zubair A. Khan (6275265)
TRIVEDI & KHAN, P.C.
550 W. Washington Boulevard, Suite 201
Chicago, IL 60661
Phone: (312) 612-7619
Fax: (224) 353-6348
Email: service@trivedikhan.com

## VERIFICATION

Danial Danish, being duly sworn, states that as an individual and authorized

agent of Danish Consultancy, Inc. and Azmi Consulting, Inc., I have reviewed the

allegations of this Answer. I have answered the allegations of the Complaint to the best

of my knowledge. As to allegations of which I do not have personal knowledge, I rely on

the representations of directly knowledgeable third parties, and I believe them to be

true.

In accordance with 28 U.S.C. § 1746, I declare and verify under penalty of perjury that

the foregoing statement is true and correct.

on

Inc.,

Danial Danish, individually and

behalf of Danish Consultancy,

and Azmi Consulting, Inc.